IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES,                          3:12-CR-00578-BR

        Plaintiff,                      OPINION AND ORDER

v.

RICHARD L. OBERDORFER,

        Defendant.


**S. AMANDA MARSHALL**
United States Attorney
**NEIL J. EVANS**
Assistant United States Attorney
1000 S.W. Third, Suite 600
Portland, OR  97204
(503) 727-1012

        Attorneys for Plaintiff

**BRIAN L. MICHAELS**
259 East Fifth Avenue
Suite 300-D
Eugene, OR 97401
(541) 687-0578

        Attorney for Defendant


1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant Richard L. Oberdorfer's appeal of Magistrate Judge Dennis J. Hubel's April 24, 2013, Order denying Oberdorfer's Motion to Dismiss; denying Oberdorfer's May 31, 2013, oral Motion to Acquit; and denying Oberdorfer's June 19, 2013, oral Motion for Judgment of Acquittal.  For the reasons that follow, the Court **AFFIRMS** Magistrate Judge Hubel's denials of Oberdorfer's Motions and **AFFIRMS** the Judgment entered August 5, 2013.

<u>**BACKGROUND**</u>

Defendant Richard L. Oberdorfer is the president and sole owner of the assets of Western Radio Services Company, a corporation.  Western Radio operates a telecommunications tower and generator building on land leased from the United States Forest Service at the Walker Mountain Communication Site within the Deschutes National Forest.

In 2000 the Forest Service and Western Radio entered into a lease in which the Forest Service authorized Western Radio to use a specific parcel of land on Walker Mountain for constructing, operating, and maintaining a communications facility.

On September 13, 2004, Oberdorfer submitted to the Forest Service a special-use application on behalf of Western Radio in which Western Radio sought to expand the size of its building on

2 - OPINION AND ORDER

Walker Mountain and to install a generator with a greater capacity.

On October 31, 2005, Leslie Weldon, the Forest Supervisor for the Deschutes National Forest in 2005, issued a "Decision Memo" in which she stated in pertinent part:  "I have decided to authorize the expansion of the Western Radio communication building."  Weldon noted in the Decision Memo that an environmental assessment and an environmental impact statement were not required based on her conclusion that the project would not affect threatened or endangered species, wetlands, Native American religious or cultural sites, or other interests protected by law.

On March 1, 2006, Oberdorfer submitted a letter to the Forest Service in which he proposed constructing a second tower to replace Western Radio's existing communications tower on Walker Mountain.  Attached to the letter were a map of the Walker Mountain site with an arrow pointing to the location of the new tower and the manufacturer's specifications for the proposed new tower.

On September 18, 2007, John Allen, the Forest Supervisor at that time, issued a "Decision Memo" in which he stated:  "I have decided to authorize the replacement of the Western Radio communication tower . . . on the Walker Mountain Communication Site."  Allen concluded neither an environmental assessment nor

an environmental impact statement were required.  Western Radio,
however, did not begin work on the second communications tower.

On December 9, 2009, Holly Jewkes, District Ranger for
Walker Mountain, sent Oberdorfer a letter in which she noted the
Forest Service had completed a "communication site inspection" at
Walker Mountain on August 19, 2009, during which Western Radio's
facilities were inspected.  Jewkes noted various items for
Western Radio's "correction and/or information."  Jewkes then
noted the September 18, 2007, Decision Memo related to the
replacement of Western Radio's communication tower and stated in
pertinent part:

> 1.  Be advised that if Western is planning to
>     pursue the tower replacement, I will require
>     a new 30-day technical review period for all
>     existing authorization holders at Walker
>     Mountain including the Forest Service.
> 2.  Execution of a Western communications use
>     lease amendment to authorize the construction
>     of a Western replacement tower would be, in
>     part, contingent upon the results of this
>     technical review period.

SER[1] 56.

On June 17, 2010, Jewkes sent Oberdorfer a letter by
certified mail "to clarify the elements for Western Radio's
proposed building and tower improvements."  SER 51.  Jewkes noted
the 2005 Decision Memo "authorized one building expansion up to
384 square feet with a maximum 10 foot side wall" and the 2007

---

[1] Government's Supplemental Excerpts of Record (SER)(#99).

Decision Memo "authorized one self-supported 80-foot tower."
Jewkes advised Oberdorfer that if Western Radio's "project design
intent still conform[ed]" to the 2005 and 2007 Decision Memos,
the Forest Service would not have to conduct any "further NEPA
analysis." *Id*. Nevertheless, Jewkes advised Oberdorfer that
Western Radio would still

> need to submit a technical data form FS 2700-10
> for 30-day comment to all existing authorized
> users on Walker Mountain, including the Forest
> Service. Execution of a communications use lease
> amendment which authorizes construction, is
> contingent (in part) on the results of this
> comment period.

SER 51.

Jewkes testified at trial that Oberdorfer did not approach
her at any time between June 17, 2010, and October 21, 2010, to
obtain final authorization to proceed with construction of the
second communications tower on Walker Mountain.

In August 2010 Western Radio began construction on a second
communications tower on Walker Mountain.

Shortly before October 21, 2010, the Forest Service
discovered Western Radio had begun construction on the second
communications tower. At that point Jewkes emailed Oberdorfer
and directed him to cease construction because he had not
received Forest Service approval to construct the second
communications tower. On October 21, 2010, Jewkes sent
Oberdorfer a letter via certified mail in which Jewkes noted

Forest Service personnel had observed Western Radio had begun construction of a second communications tower.  Jewkes pointed out that she had advised Oberdorfer in her December 2009 letter that the following steps were to be completed before he would be authorized to start construction:

> 1.   [A] new 30-day technical review period for all existing authorization holders at Walker Mountain including the Forest Service.
> 2.   Execution of a Western communications use lease amendment to authorize the construction of a Western replacement tower . . . contingent [in part] upon the results of this technical review period.

SER 48.  Jewkes noted the Forest Service had received the return receipt for her December 9, 2009, letter signed by Oberdorfer on December 17, 2009.  Jewkes advised Oberdorfer that as of October 21, 2010, "no letter of written approval has been provided to your office.  Until the above conditions . . . [are] met . . ., you are hereby required to cease construction of the tower and associated structures immediately."  SER 49.

On November 4, 2010, Oberdorfer sent Jewkes an email in which he acknowledged the requirements set out in Jewkes's December 9, 2009, letter and stated "Western has not had any new equipment proposals to coordinate with the other holders and the Forest Service since December 2009.  I had anticipated sending out some 2700-10 forms prior to beginning construction this summer."  He acknowledged, however, that he did not send out any 2700-10 forms for reasons unrelated to this action.  SER 46.

Oberdorfer asserted:

> Western has been authorized an 80 foot tower at
> the Walker Mountain Site for 30 years.  When the
> construction is completed, Western will still be
> authorized an 80 foot tower. . . .  [I]f there is
> something to amend in the lease, it certainly
> could be done during or after construction.  It
> was unreasonable of you to stop construction for
> such an insignificant administrative matter.
>
>                * * *
>
> If there is some new requirement that the Forest
> Service is imposing on existing holders, I fail to
> see the need to stop construction while admini-
> strative matters are attended to.  Now that I have
> affirmed Western's commitment to coordinate
> proposals with other users, it would seem
> appropriate for you to begin dealing with any
> remaining administrative matters instead of
> signing more harassing letters generated by Forest
> Service attorneys.

SER 46-47.

On November 23, 2010, Jewkes sent Oberdorfer a letter by

certified mail in which she responded to Oberdorfer's November 4,

2010, email and advised him that

> Western Radio Services (Western) breached the
> terms and conditions of its Communications Use
> Lease (CRB09)(hereinafter "Lease") by constructing
> a new tower and an addition to its generator
> building on Walker Mountain without prior
> authorization.  Western's breach constitutes
> grounds for the revocation of its Lease (Clause V,
> B 2). Additionally, Western's actions violate 36
> C.F.R. § 261.10(a).
>
>                * * *
>
> As previously stated in my October 21, 2010,
> June 17, 2010, and December 9, 2009, letters,
> *before it could commence construction*, Western was
> required to execute an amendment to its Lease that

7 - OPINION AND ORDER

> would authorize that construction.  In those
> letters, I repeatedly explained that you were
> required to submit a technical form FS 2700-10 to
> all existing users on Walker Mountain for 30-day
> comment before the agency would consider amending
> the Lease to authorize construction.  Western did
> not initiate the requisite 30-day comment period
> and consequently never obtained the requisite
> Lease amendment.
>
> Under the terms of its Lease, Western is
> authorized to operate and maintain the 192
> square-foot building and 80-foot tower that it
> constructed 30 years ago.  The Lease did not
> authorize Western to construct a building addition
> or a new 80-foot tower, and by doing so, Western
> breached the terms of its Lease and 36 C.F.R.
> § 261.10(a).  The Lease also does not authorize
> Western to maintain or operate the new building or
> tower.  Consequently, the continued presence and
> operation of the structures constitute separate
> and ongoing breaches of the Lease and 36 C.F.R.
> § 261.10(a).

SER 44 (emphasis in original).

On May 26, 2011, the United States filed a civil action against Western Radio in which the government alleged, among other things, that the second tower and other improvements were not authorized and Western Radio's actions constituted trespass and a breach of Western Radio's lease.  *See United States v. Western Radio Servs. Co.*, No. 03:11-CV-00638-SI.

On May 23, 2012, the government filed a motion for partial summary judgment in the civil case as to its claim of trespass.

On June 29, 2012, the government filed a second motion for partial summary judgment in the civil case as to its claim for breach of contract.

8 - OPINION AND ORDER

On August 2, 2012, Assistant United States Attorney Neil
Evans sent Oberdorfer a letter in which Evans noted:

> The United States Attorney's Office has received
> information that Western Radio and Richard
> Oberdorfer are taking action(s) to place
> additional equipment on the unauthorized tower on
> Walker Mountain.
>
> *  *  *
>
> The United States, through the Forest Service, has
> not authorized any additional work on Walker
> Mountain by Western Radio, Richard Oberdorfer, or
> customers and tenants of Western Radio.  Any
> activity involving the unauthorized tower,
> expansion of the existing building or completion
> of the new generator pad is not authorized and is
> in violation of the Western Radio lease as well as
> federal laws, both civil and criminal.
> Independent of the pending [civil] lawsuit, the
> United States will enforce all appropriate laws if
> there is any additional activity undertaken
> without express authorization from the Forest
> Service or a Court Order.

SER 43.

Forest Service Officer Sean Reed and Jewkes posted the
August 2, 2012, letter in three places at the Western Radio site
on Walker Mountain on August 3 or 5, 2012.

On August 24, 2012, Judge Michael Simon heard oral argument
on the government's motions in the civil case.

On August 28, 2012, Jewkes received a telephone call from
Meria Page, a Forest Service employee, who advised Jewkes that
there was some "work activity" occurring at the Western Radio
tower.  At Jewkes's request, Reed went to the Western Radio site
on August 28, 2012.  Reed observed Oberdorfer and another

9 - OPINION AND ORDER

individual raising and lowering parts onto the second
communications tower, welding brackets, and relocating
antennas onto the second tower.  Reed also observed the copies
of the August 2, 2012, letter that he placed at the site on
August 3 or 5, 2012, were no longer posted.  Reed took
photographs and gave Oberdorfer an order to stop work on the
second tower.  Oberdorfer stopped work on the tower approximately
five minutes after Reed issued the order.  At that point Reed
issued a citation to Oberdorfer for violation of 36 C.F.R.
§ 261.10 for constructing and maintaining a structure on Forest
Service property without authorization.  After Reed issued the
citation, Oberdorfer finished relocating antennas on the second
tower.

On August 29, 2012, Judge Simon issued an Opinion and Order
in the civil case in which he, among other things, granted the
government's motions for summary judgment as to the issue of
liability.  Judge Simon concluded Western Radio had "breached two
provisions of the parties' lease by not obtaining formal
authorization for the new construction and by not submitting
detailed construction plans before starting construction."  Judge
Simon also concluded Western Radio's failure to obtain formal
authorization before building the second tower and making other
modifications to the Walker Mountain site "exceeded the Forest
Service's consent to use of the land and constitute[d] trespass."

10 - OPINION AND ORDER

On October 31, 2012, the government charged Oberdorfer in a single-count Information with "construct[ing] and maintain[ing] a structure and plac[ing] communications equipment on Forest Service land without authorization" between August 28, 2012, and September 8, 2012, in violation of 36 C.F.R. § 261.10(a).

On March 8, 2013, Oberdorfer, appearing before Magistrate Judge Dennis Hubel, made an oral Motion to Dismiss the criminal charge on the ground of double jeopardy.

On April 24, 2013, following supplemental briefing, Magistrate Judge Hubel issued an Order denying Oberdorfer's Motion to Dismiss on the ground that his arguments were not supported by the law or the facts.

On May 3, 2013, Oberdorfer filed a Notice of Interlocutory Appeal of the April 24, 2013, Order in the Ninth Circuit.

On May 7, 2013, the government filed a Motion to Certify [Oberdorfer's] Double Jeopardy Claim as Frivolous.

On May 13, 2013, Magistrate Judge Hubel granted the government's Motion to Certify Oberdorfer's Double Jeopardy Claim as Frivolous.  Also on May 13, 2013, the Ninth Circuit entered an order closing Oberdorfer's appeal and transferring Oberdorfer's appeal to this Court.

On May 29, 2013, this Court held oral argument on Oberdorfer's appeal, dismissed Oberdorfer's appeal on the ground that his double-jeopardy claim is not "at least colorable," and

11 - OPINION AND ORDER

affirmed Magistrate Judge Hubel's Order finding the appeal to be frivolous.

On June 11, 2013, Judge Simon entered a Judgment in the civil case in which he ordered, among other things, that Western Radio "remove all trespassing structures (*i.e.*, the new tower and accompanying improvements constructed during or after August 2010) no later than August 15, 2013, and all restoration of the site shall be completed by August 30, 2013." 3:11-CV-00638-SI (#226). Judge Simon did not order Western Radio to post a bond.

On May 31 and June 19, 2013, Magistrate Judge Hubel held a court trial on Oberdorfer's violation of § 261.10. At the close of the government's case, Oberdorfer orally moved for acquittal on the ground that he had authorization to build the second tower. Magistrate Judge Hubel denied Oberdorfer's Motion. At the close of the defense case, Oberdorfer orally moved for judgment of acquittal on a "choice-of-evils" defense. Magistrate Judge Hubel denied Oberdorfer's Motion.

On July 24, 2014, Magistrate Judge Hubel held a hearing at which he found Oberdorfer guilty of violating 36 C.F.R. § 261.10 and sentenced Oberdorfer to 24-months probation, a $500 fine, and a $10 special assessment.

On August 5, 2013, a Judgment was entered against Oberdorfer in the criminal matter.

On August 6, 2013, Oberdorfer filed an appeal from the

12 - OPINION AND ORDER

decisions of Magistrate Judge Hubel with this Court.  This matter was fully briefed on January 31, 2014, and the Court took the matter under advisement on that date.


**STANDARDS**

Federal Rule of Criminal Procedure 58(g)(2)(A), which applies to petty offenses and misdemeanors, provides in pertinent part that a party "may appeal an order of a magistrate judge to a district judge . . . if a district judge's order could similarly be appealed."

On appeal the Court reviews questions of law *de novo* and findings of fact for clear error.  *See United States v. Ziskin*, 360 F.3d 934, 943 (9th Cir. 2003).  *See also United States v. Perdomo-Espana*, 522 F.3d 983, 986 (9th Cir. 2008).  This Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Strong*, 79 F.3d 925, 928 (9th Cir. 1996).


**DISCUSSION**

**I.    Oberdorfer's Motion to Dismiss**

Oberdorfer appeals Magistrate Judge Hubel's April 24, 2013, Order denying Oberdorfer's Motion to Dismiss on the ground of

13 - OPINION AND ORDER

double jeopardy and/or claim splitting.

**A.    Standards**

"When reviewing a denial of a motion to dismiss on double jeopardy grounds[, the court must] 'review *de novo* legal questions' but 'review factual findings, including those on which denial may be based, for clear error.'" *Id*. (quoting *United States v. Ziskin*, 360 F.3d 934, 943 (9th Cir. 2003)).

The Fifth Amendment's prohibition against double jeopardy "'protects against being punished twice for a single criminal offense.'" *United States v. Brooks*, 610 F.3d 1186, 1194 (9th Cir. 2010)(quoting *United States v. Davenport*, 519 F.3d 940, 943 (9th Cir. 2008)).

"[T]he Double Jeopardy Clause does not prohibit the imposition of all . . . sanctions that could, in common parlance, be described as punishment. . . .  The Clause protects only against the imposition of multiple *criminal* punishments for the same offense, . . . and then only when such occurs in successive proceedings." *Hudson v. United States*, 522 U.S. 93, 98-99 (1997) (internal quotations and citations omitted)(emphasis in original).

> [When] the same act constitutes a violation of two different statutes, the test to determine whether punishment for both offenses may be imposed is whether each provision requires proof of a fact which the other does not. . . .  The elements of the offenses are determinative, even if there is a substantial overlap in their proof.

*Id.* (internal quotations and citations omitted).

Courts distinguish "between an act continuous in its character and a case where the statute is aimed at an offense that can be committed [all at once]." *Blockburger v. United States*, 284 U.S. 299, 302 (internal quotations and citation omitted).

### B. Analysis

On appeal Oberdorfer reiterates the arguments he made before Magistrate Judge Hubel and in his interlocutory appeal to this Court in support of his contention that his double-jeopardy claim is colorable. Specifically, Oberdorfer asserts he and Western Radio are virtually the same because he is the sole owner of Western Radio's assets, and, therefore, they are in privity; the actions underlying the Information are part of a continuous stream of events that were already the subject of the civil case; and the monetary damages sought by the government in the civil case are not merely civil damages, but are, in fact, "punitive in purpose and result" and intended to punish Oberdorfer. According to Oberdorfer, the civil case was criminal in nature because it was punitive in purpose and effect, and, therefore, Oberdorfer may not be subjected to a separate prosecution for the same conduct in the criminal matter.

The Fifth Amendment "'protects against being punished twice for a single criminal offense.'" *United States v.*

*Brooks*, 610 F.3d 1186, 1194 (9th Cir. 2010)(quoting *United States v. Davenport*, 519 F.3d 940, 943 (9th Cir. 2008)).  When "the same act constitutes a violation of two different statutes, the test to determine whether punishment for both offenses may be imposed is whether each provision requires proof of a fact which the other does not."  *Id.* (internal quotations and citations omitted).  In the context of double jeopardy, courts also distinguish "between an act continuous in its character" and "a case where the statute is aimed at an offense that can be committed [all at once]."  *Blockburger v. United States*, 284 U.S. 299, 302 (1932)(internal quotations and citation omitted).  *See, e.g., United States v. Mancuso*, 718 F.3d 780, 793 (9th Cir. 2013).  Nevertheless, "the Double Jeopardy Clause does not prohibit the imposition of all . . . sanctions that could, in common parlance, be described as punishment. . . .  The Clause protects only against the imposition of multiple *criminal* punishments for the same offense, . . . and then only when such occurs in successive proceedings."  *Hudson v. United States*, 522 U.S. 93, 98-99 (1997)(internal quotations and citations omitted)(emphasis in original).

In any event, the Court, as it did in Oberdorfer's interlocutory appeal, continues to agree with Magistrate Judge Hubel's analysis that this matter does not implicate the Double Jeopardy Clause because this matter and the civil action involve

16 - OPINION AND ORDER

different facts and law.  As noted, the charge in the Information
is based on Oberdorfer's actions in August and September 2012,
which had not yet occurred at the time the government filed the
civil case against Western Radio.  In addition, this case
involves violation of § 261.10, which prohibits constructing and
maintaining a structure on Forest Service property without
authorization, while the civil matter was for breach of Western
Radio's lease agreement and for the common-law tort of trespass.

     The Ninth Circuit has held "the government may act in
bad faith if it brings a civil action solely for the purpose of
obtaining evidence in a criminal prosecution and does not advise
the defendant of the planned use of evidence in a criminal
proceeding."  *United States v. Stringer*, 535 F.3d 929, 936-37
(9th Cir. 2008)(citations omitted).  There is not any indication
on this record, however, that the government conducted its
investigation into Western Radio's 2010 construction of the
communications tower for the purpose of later filing a criminal
action against Oberdorfer.  As noted, the acts with which
Oberdorfer was charged in violation of § 261.10 had not occurred
when the government's dispute with Western Radio arose.

     In addition, this criminal action is against Oberdorfer
personally and the civil action was against Western Radio, a
corporation.  Even if Oberdorfer and Western Radio are in
"privity," criminal prosecution of Oberdorfer following the civil

17 - OPINION AND ORDER

action involving Western Radio does not implicate the Double
Jeopardy Clause.  The Ninth Circuit has long recognized a
corporation and its officers are distinct legal "persons"[2] for
purposes of criminal prosecution.  *See, e.g., Pankratz Lumber
Co. v. United States*, 50 F.2d 174, 174-75 (9th Cir. 1931)
("Appellant [corporation] is a distinct corporate entity, and the
fact that its officers are the sole stockholders does not change
the status or relation.").  *See also Western Laundry and Linen
Rental Co. v United States*, 424 F.2d 441, 443-44 (9th Cir. 1970).

In *Pankratz* the Ninth Circuit held a corporation is an
entity distinct from its officers and a corporation cannot invoke
the acquittal of its officers for claim preclusion even when
those officers are the sole shareholders.  50 F.2d at 174-75
("[A]ppellant may not claim that the verdict of not guilty as to
the officers is inconsistent as to it and, therefore, *res
adjudicata*.").  Similarly, in *Western Laundry* the Ninth Circuit
rejected the defendant's argument that the simultaneous
indictment of the individual defendant and his partnership under
the Sherman Act violated his protection against double jeopardy.
424 F.2d at 443.  The Ninth Circuit noted:

> The defendant would not make this argument if
> Western had been a corporation, in which Hazan was
> a stockholder.  In that case the corporation would

---

[2] The Supreme Court has made clear "person" includes
corporations for purposes of the Double Jeopardy Clause.  *United
States v. Martin Linen Supply Co.*, 430 U.S. 564 (1977).

> have been a distinct legal entity, in the assets
> of which no person other than the corporation had
> an ownership interest.  If the indictment resulted
> in a conviction of the corporation, and a fine
> levied against it, the Government would collect
> its fine out of the corporation's assets, if it
> collected it at all.  If an officer or stockholder
> of that corporation had been indicted, in the same
> indictment with the corporation, as a conspirator
> in the violation of the Sherman Act, and had been
> convicted and sentenced, the Government would have
> had to collect its fine from the stockholder's or
> officer's individual assets, if it collected it at
> all. . . .  If the stockholder had a large
> stockholder's interest in the corporation, the
> outcome of the proceeding against the corporation
> would be of vital concern to him, because of its
> effect upon the value of his stock.  *But no
> problem of double jeopardy would be involved.*

*Id.* at 444 (emphasis added).  Here, as in *Western Laundry*, the

civil action against Western Radio and the criminal action

against Oberdorfer personally do not implicate the Double

Jeopardy Clause because Oberdorfer and Western Radio are not the

same "person" for purposes of the Double Jeopardy Clause.

Finally, the Court concludes the remedy ordered in the

civil matter (removal of the second tower) is not so punitive as

to constitute a criminal penalty for purposes of double jeopardy.

In *Hudson* the Supreme Court noted even when the legislature has

indicated an intent to establish only a civil penalty, the Court

has "inquired further whether the statutory scheme was so

punitive either in purpose or effect . . . [to] transfor[m] what

was clearly intended as a civil remedy into a criminal penalty."

522 U.S. at 99 (quotation omitted).  The Supreme Court identified

seven factors that provide "useful guideposts" when determining whether a civil remedy is so punitive as to be transformed into a criminal penalty for purposes of double jeopardy:

> (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

*Id*. at 99-100 (quotations omitted).  "'[O]nly the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.'" *United States v. Reveles*, 660 F.3d 1138, 1143 (9th Cir. 2011) (citing Hudson, 522 U.S. at 99)(emphasis in *Reveles*).  "With this very high burden, even a showing that most of the relevant factors weigh in favor of considering a punishment criminal in nature may be insufficient to transform it into a criminal punishment." *Reveles*, 660 F.3d at 1143.  Thus, the remedy ordered by Judge Simon (removal of the second tower) does not constitute an affirmative disability or restraint on Oberdorfer.

Analogous to the issue in this matter, the Supreme Court has held civil *in rem* forfeitures do not violate the Double Jeopardy Clause because such forfeitures do not constitute a "punishment" under the Double Jeopardy Clause.  *See United States v. Ursery*,

518 U.S. 267, 270-71 (1996). Similarly, the Ninth Circuit has concluded there is not any affirmative disability or restraint when the punishment involves only monetary penalties, which do not "approach[] the infamous punishment of imprisonment." *Reiserer v. United States*, 479 F.3d 1160, 1163 (9th Cir. 2007) (Internal Revenue Service statutes that impose civil monetary penalties for promoting tax shelters and aiding the understatement of tax liabilities are "not so punitive as to render the sanctions criminal."). In addition, "monetary penalties have not been historically regarded as punishment." *Reiserer*, 479 F.3d at 1163.

With respect to the issue as to whether the equitable penalty awarded by Judge Simon promotes retribution and deterrence, the Ninth Circuit has noted "[a] civil penalty that bear[s] no rational relationship to actual damages may not fairly be characterized as remedial, but only as a deterrent or retribution, and this constitutes 'punishment' for purposes of double jeopardy." *United States v. Gartner*, 93 F.3d 633, 635 (9th Cir. 1996). The existence, however, of some deterrent against future behavior is not sufficient for the defendant to prevail under this prong. As the Supreme Court noted in *Hudson*, "all civil penalties have some deterrent effect." 522 U.S. at 102. The Court acknowledged "the imposition of . . . money penalties . . . will deter others from emulating petitioner's

21 - OPINION AND ORDER

conduct, a traditional goal of criminal punishment.  But the mere presence of this purpose is insufficient to render a sanction criminal, as deterrence may serve civil as well as criminal goals."  522 U.S. at 105 (internal citations omitted).  *See also Gartner*, 93 F.3d at 635 ("An obvious deterrent purpose, however, . . . does not automatically convert [a] penalty into 'punishment.'").  Here Judge Simon required only that Western Radio remove the second tower.  The Court concludes such a penalty is not without any rational relationship to actual damages.  In fact, the removal of a trespassing structure is the typical remedy sought by landowners whose property rights have been infringed by another's trespass.  According to the Ninth Circuit, "[s]tatutes authorizing punishments that have purposes other than furthering the traditional criminal justice objectives of deterrence and retribution are less likely to be criminal in nature." *Reveles*, 660 F.3d at 1144–45.  The Ninth Circuit has held the existence of a rational connection to a nonpunitive purpose is "a most significant factor" when determining whether a penalty is actually a punishment.  Thus, Judge Simon's order to remove the second tower is rationally connected to the nonpunitive purposes of maintaining and protecting Forest Service lands, permitting the Forest Service to manage its lands for the common good, and holding leaseholders to the terms of their leases with the federal government.  Those purposes are

22 - OPINION AND ORDER

distinctly nonpunitive and are directed towards the federal government's authority to exercise control over the lands that it owns and leases.  These nonpunitive purposes are similar to the government's nonpunitive purposes in *Reveles* in which the court concluded "a primary purpose of [nonjudicial disciplinary punishment] is to maintain military order, a purpose distinct from those underlying traditional criminal punishment." *Reveles*, 660 F.3d at 1145.

On this record the Court concludes the Magistrate Judge did not err when he denied Oberdorfer's Motion to Dismiss on the ground of double jeopardy.  Accordingly, the Court affirms Magistrate Judge Hubel's April 24, 2013, Order denying Oberdorfer's Motion to Dismiss.

## II.  Choice-of-Evils Defense

Oberdorfer asserts the Magistrate Judge erred when he denied Oberdorfer's oral Motion to Acquit based on a choice-of-evils defense.  Oberdorder asserts building the second tower was necessary for the protection of his business, his customers' equipment, and the National Forest area.  Specifically, Oberdorfer asserted at trial that building a second tower and moving equipment from the first tower to the second tower was necessary because the first tower might have collapsed in the winter due to ice if he had not done so.

To succeed on a choice-of-evils defense, a defendant must

establish:  (1) he was faced with a choice of evils and chose the lesser evil, (2) he acted to prevent imminent harm, (3) he reasonably anticipated a causal relation between his conduct and the harm to be avoided, and (4) there were not any other legal alternatives to violating the law. *United States v. Bibbins*, 637 F.3d 1087, 1094 (9th Cir. 2011)(quotation omitted). "[I]mpatience does not constitute the 'necessity' that the defense of necessity requires." *United States. v. Dorrell*, 758 F.2d 427, 431 (9th Cir. 1985).  If there was a reasonable legal alternative to violating the law, the defense fails. *Id*.  The defense was intended to be used in situations of "real emergency" rather than when the defendant is merely faced with a choice of several actions. *Id*.

To establish there was an imminent harm of the first tower collapsing if the second tower was not built and equipment was not moved from the first tower to the second tower, Oberdorfer relies on a statement in Weldon's October 31, 2005, Decision Memo that "USDA Forest Service will replace a communication tower that collapsed during the winter of 2003-2004 due to heavy snow loads." Def.'s Ex. 104.  Oberdorfer also relies on a 2006 load study conducted by Verizon as to equipment that Verizon wanted to place on the first tower (Verizon concluded in the study that the first tower would have been at 160-170% "of load" with Verizon's equipment).  The record, however, reflects Verizon never put its

equipment on the first tower, there was not another load study done after the 2006 Verizon study, and there is not any evidence in the record of the load on the first tower without Verizon's equipment.

None of the Forest Service witnesses were familiar with the collapsed tower's location, condition, or comparability to Oberdorfer's first tower.  Although Oberdorfer testified he was "fairly confident" that the design of the collapsed tower was identical to the design of his first tower, the record is devoid of evidence related to the age, location, construction, condition, or comparability of the collapsed tower.  The record, therefore, does not support a conclusion that there was an "imminent harm" of the first tower collapsing in August 2012 when Oberdorfer was cited for violating § 261.10.

The record also reflects the first tower had been standing since at least 2005 and continued to withstand winter ice and snow at the time of the trial in May and June 2013.  The first tower had not collapsed under the usual amount of ice and snow at the Walker Mountain site for at least eight years, and there was not any evidence in the record that the winter of 2012 was predicted to be particularly harsh or icy to a degree that would cause Oberdorfer to become concerned about the collapse of the first tower.

Finally, even if Oberdorfer had a reasonable concern about

25 - OPINION AND ORDER

an imminent harm in August 2012, the record does not reflect that there was no legal alternative to continuing construction of and moving equipment to the second tower.  For example, Oberdorfer could have followed through with the Forest Service's decisionmaking process by providing Jewkes with the information she requested in her several letters of 2009 and 2010 or he could have waited for Judge Simon to issue an opinion and order as to the parties' motions for summary judgment in the civil matter that related to the question of the legitimacy of the second tower.  Both actions would have been plausible alternatives to continuing construction of and moving equipment to the second tower.

On this record the Court concludes Magistrate Judge Hubel did not err when he denied Oberdorfer's Motion for Acquittal on the ground of choice-of-evils.  Accordingly, the Court affirms Magistrate Judge Hubel's denial of Oberdorfer's Motion on that ground.

**III. Judgment of Acquittal**

Oberdorfer asserts the Magistrate Judge erred when he did not grant Oberdorfer's Motion for Judgment of Acquittal on grounds other than choice-of-evils.  Specifically, Oberdorfer asserts the record reflects he had authority to continue to build the second tower and to move equipment to that tower between August 28, 2012, and September 8, 2012.

26 - OPINION AND ORDER

As noted, § 261.10(a) prohibits

> [c]onstruction, placing or maintaining, any kind
> of road, trail, structure, fence, enclosure,
> communications equipment, significant surface
> disturbance, or other improvements on National
> Forest System lands or facilities without a
> special-use authorization, contract or approved
> operating plan when such authorization is
> required.

Under § 261.10(a) the government must prove beyond a reasonable

doubt that the (1) defendant constructed or maintained a

structure or placed communications equipment, (3) on National

Forest Service lands, and (3) without a special-use

authorization.  Intent is not a required element of the offense.

36 C.F.R. § 261.1(c).  The fact that a defendant had a special-

use authorization is an affirmative defense to a charged

violation of §261.10(a).  *See United States v. Gravenmeir*, 121

F.3d 526 (9th Cir. 1997)(When a "statutory prohibition is broad

and the exception narrow, the exception is probably an

affirmative defense, not an element of the crime.").  *See also*

*United States v. Lowry*, 512 F.3d 1194 (9th Cir. 2008)(defendant's

authority to occupy Forest Service land under the Forest

Allotment Act is an affirmative defense).

Oberdorfer relies on the September 18, 2007, Decision Memo

to support his assertion that he had the authority to continue to

construct and to add equipment to the second tower in August

2012.  In support of his position, Oberdorfer points out that the

2007 Decision Memo did not contain any information about further

27 - OPINION AND ORDER

actions that Oberdorfer had to take in order to begin
construction.

There was, however, ample testimony at trial from various
Forest Service employees that the 2007 Decision Memo was not an
authorization to construct or to add to the second tower, but, in
fact, was a "NEPA document" and only one piece of the
authorization process.  For example, John Allen testified a
Decision Memo is a NEPA document that "precedes a special use
permit or the modification of a special use permit."  Tr. 159.
Allen explained Decision Memos do not contain information about
further actions that applicants need to complete for special-use
permits or modifications of special-use permits:  "There wouldn't
be implementation instructions in a NEPA document.  They're in a
special use permit."  Tr. 158.  Allen further noted "the decision
memo is . . . an internal Forest Service document that you've
done NEPA, you're now communicating back to the district to say,
'You can begin your implementation of the proposal.'"  Tr. 163.
Thus, the 2007 Decision Memo was "the way to communicate [to
Oberdorfer] the -- that fact that NEPA's been done."  Tr. 163.

Similarly, Jewkes noted Oberdorfer was required to submit a
technical form 2700-10 to existing users on Walker Mountain for a
30-day comment period before the Forest Service would consider
authorizing construction of the second tower.  Tr. 136.  Jewkes
testified "the technical review period is intended to happen

28 - OPINION AND ORDER

before one constructs and places equipment on a tower." Tr. 137.
In addition, Jewkes testified even if a technical review was done
in 2004 related to Oberdorfer's application for an additional
tower, there had been more developments on Walker Mountain
between 2007 and 2010 and, therefore, there could have been
"technical coordination issues that existed in 2010 that didn't
exist in 2004." Tr. 137. Jewkes testified she has "the
authority" as the District Ranger "to request [another technical
review], regardless of whether it had been done five or six years
before." Tr. 137. Jewkes also testified the Decision Memo was
"the start of a conversation as information" with respect to an
application for a special-use permit. Tr. 138. Jewkes testified
the Forest Service would like information such as "exact
location, whether there [were] construction plans . . . what they
are, what kind of equipment they're going to use, whether there's
a potential for invasive weeds to come in on that equipment," and
when construction is proposed to begin. Tr. 138-39. Jewkes also
testified the Forest Service did not have any of that information
relative to the second tower in October 2010 or in August 2012.
Tr. 139.

In addition, even if it was not clear to Oberdorfer when he
received the 2007 Decision Memo that it was not an authorization
to begin work on a second tower, the record reflects it should
have been abundantly clear to Oberdorfer before August 28, 2012,

that the Forest Service did not consider him to be authorized to
build or to continue construction on the second tower.  As noted,
prior to August 28, 2012, Oberdorfer received five letters from
the Forest Service informing him that he was not authorized to
construct or to continue construction on a second tower.  After
May 26, 2011, construction of the second tower was the subject of
the civil action.  On August 3 or 5, 2012, the Forest Service
posted in three places on Western Radio's Walker Mountain site
copies of the August 2, 2012, letter informing Oberdorfer that he
was not permitted to continue construction on the second tower.
Oberdorfer, in fact, testified at trial that he read the
August 2, 2012, letters and took them down.  Tr. 205.

Moreover, Meria Page, the Crescent Ranger District Special
Use Administrator, testified at trial that the site lease
provided by the Forest Service to Western Radio did not authorize
construction of the second tower or any other structures at the
site.  Tr. 51.  Page pointed out that 36 C.F.R. § 251.62, the
Forest Service regulation relating to special-use authorizations,
provides "a special use authorization shall become effective when
signed by both the applicant and the authorized officer."  The
2007 Decision Memo on which Oberdorfer relies contains only the
signature of John Allen.  Oberdorfer does not point to any
document in the record that allegedly acted as a special-use
authorization that is signed by both a Forest Service officer and

30 - OPINION AND ORDER

Oberdorfer.

On this record the Court concludes Magistrate Judge Hubel did not err when he denied Oberdorfer's Motion for Judgment of Acquittal because the Court finds the government proved beyond a reasonable doubt that Oberdorfer constructed or maintained a structure or placed communications equipment on National Forest Service lands without a special-use authorization.  Accordingly, the Court affirms Magistrate Judge Hubel's denial of Oberdorfer's Motion.

## **CONCLUSION**

The Court **AFFIRMS** Magistrate Judge Hubel's denials of Oberdorfer's Motion to Dismiss, Motion to Acquit, and Motion for Judgment of Acquittal.  Accordingly, the Court **AFFIRMS** the Judgment entered August 5, 2013, in favor of the government and **DISMISSES** this appeal.

IT IS SO ORDERED.

DATED this 3rd day of April, 2014.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge